2025 IL App (2d) 240306-U
No. 2-24-0306
Order filed August 7, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-2027 |
| ERNESTO D. TAMAYO, | ) ) ) | Honorable Christopher D. Lombardo, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing the defendant's claim of ineffective assistance of counsel where the trial court found the defendant's motion to be entirely based on evidence and witnesses previously ruled upon or based on trial strategy. Affirmed.

¶ 2    Defendant directly appeals his convictions on two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2022)). In this appeal, he raises an issue with the trial court's initial *Krankel* inquiry. Specifically, defendant raised concerns over the lack of or nonuse of certain evidence and witness testimony during his trial.

¶ 3    During defendant's sentencing hearing, following his convictions, he told the trial court that his counsel failed to present certain evidence and testimony during trial. Specifically, defendant stated that his counsel failed to present "[h]ospital reports, mental health evaluations, [the victim's] drug problems, police reports ***. And the school reports and the letter from my son explaining how my daughter has been planning [to falsely accuse defendant], and also the letter from [the victim's] aunt explaining all the problems that [the victim] has." It is this statement that forms the crux of this appeal and background upon which we begin our factual recitation.

¶ 4                                    I. BACKGROUND

¶ 5    Before trial, defendant replaced his prior counsel with Mr. Ritacca. During pre-trial motions, Ritacca admitted to receiving and reviewing police reports, which included reference to a video statement by the victim, Y.C., to the Lake County Children's Advocacy Center. Furthermore, Ritacca stated he received everything regarding videos, body cameras, and interviews concerning the victim or her younger brother and their interactions with the police or medical personnel.

¶ 6                                    School Witnesses

¶ 7    Ritacca submitted a defense trial witness list which listed Taylor Travers[1], Peg Larson, and Scott Leverentz. The listed witness were employees of Antioch Community High School, Y.C.'s school. Ritacca indicated that these individuals would be called to testify on Y.C.'s behavior at school, but nothing pertaining to behavioral or disciplinary records. The trial court held that these individuals would be allowed to testify as to matters touched upon in the police report created from

_____

[1] An inconsistency within the record appears on the spelling of the last name, Travers. We have elected to use the spelling used within the defense witness list.

Y.C.'s outcry while at school. The trial court further held that the school assistant principal, Scott Leverentz, would not be allowed to testify concerning matters of her in-school behavior and the relationship between those behaviors and her medical prescriptions. At a subsequent pre-trial scheduling conference, the trial court reserved a determination on the admissibility of their testimony and its content to ensure there would be no violations of HIPAA[2] and that the testimony was relevant. Ritacca clarified to the trial court that there was no subpoena for documents or records from the school, and that the defense was in possession of statements made by the high school personnel due to their involvement within the police reports.

¶ 8                                    Police Report

¶ 9     On August 14, 2023, the trial was delayed due to a police call for service on August 12 related to a domestic incident at Y.C.'s house where apparent self-harm occurred. As a result, Y.C. was transported to Condell hospital to receive medical assistance and was then transported to Northwest Community Hospital for continued medical treatment. Ritacca requested police and paramedic reports of the incident, as well as any statements made by Y.C. concerning her hospitalization. The trial court agreed that a police report, including ambulance involvement, could potentially be relevant and stated it would be supplemental discovery. The trial court ordered the State to obtain the records and send them to the defense.

¶ 10                        Hospital Reports and Mental Health Evaluations

¶ 11    Ritacca informed the trial court of his intention to bring a doctor as another witness. He argued that the doctor would be used to testify about the medical diagnoses given to Y.C., the

---

[2] HIPAA refers to the Illinois Health Insurance Portability and Accountability Act. 215 ILCS 97/1 *et seq.* (West 2022).

prescribed medication, and the credibility of her testimony based on that medication. The trial court held that Ritacca would first be allowed to question Y.C. directly about being prescribed medication, if any, and what it was. The trial court also held that Ritacca was not allowed to use the doctor as a vehicle to disclose a medical diagnosis and make statements concerning Y.C.'s credibility. Furthermore, using the doctor as a witness to describe what certain medication may or may not do to an individual in terms of their credibility would not be allowed. The trial court also held that the doctor's testimony concerning behavioral issues would be irrelevant.

¶ 12                    Victim's Diary

¶ 13    The State acknowledged receipt of Y.C.'s diary from the defense. The trial court acknowledged that the diary may contain possible evidence showing a motive for the victim to fabricate. However, to prevent irreversible prejudice, the defense would need to show its relevance and approach the court at sidebar before submission to the jury.

¶ 14              Letters from the Victim's Aunt and Brother

¶ 15    Before trial, during a case management conference, Ritacca stated that the defense had defendant's son, J.T., write a letter concerning the alleged incident. The letter was tendered to and received by the State. The record does not contain any mention of a letter from Y.C.'s aunt.

¶ 16                        Trial

¶ 17    The State called Detective Kourtney Nemec to testify. During direct examination, Nemec testified she was employed as a school resource officer on the day of Y.C.'s outcry at school. Nemec testified regarding Y.C.'s admission into the hospital and mental health facility, as well as sexual assault investigation protocol when the victim is a minor. She testified to collecting Y.C.'s and Norma C.'s cellphones, which were both turned over to the Lake County Cyber Crimes Unit for a forensic download. The Antioch Police Department was given the forensic download once it

was complete, and the phones were later returned to Norma at the Police Department where a follow-up interview was conducted. She obtained consent from Norma to schedule a forensic interview with her son, J.T., due to his potential presence during the incident. Nemec also submitted a grand jury subpoena to review the medical records from both Condell and Lakes Behavioral. She attempted to interview Y.C.'s aunt, Brenda, but was unsuccessful due to Brenda's failure to return Nemec's phone calls. During the investigation, Nemec learned that defendant was 40 years old, and obtained his phone number. She testified that when she called the number believed to belong to defendant, a male voice answered, and identified himself as defendant.

¶ 18 On cross-examination, Nemec testified that she never met with Y.C. at the school or the hospital. She only encountered Y.C. at the advocacy center and identified marks of self-harm on her wrists. Nemec never formally interviewed Y.C., however, she did speak with her mother, and she did go to the house where the incident took place. Nemec never walked in the back yard, she only took pictures of the yard from the driveway; she did not see a recording device attached to the house. She also never swabbed for DNA or semen at the location of the sexual assault. Nemec also discussed statements made to school personnel about Y.C.'s suicidal outcry, her attempted efforts to talk to Y.C.'s aunt, and her minimal discussions with Y.C.'s mother, Norma C. Furthermore, Nemec discussed the collection of phones from Y.C. and Norma C. She never collected defendant's phone for evidence.

¶ 19 The State called Carol Gudbrandsen, a cybercrime forensic analyst with the Lake County State's Attorney, to testify. Gudbrandsen testified to the process and procedure she used in examining the two cellphones provided to her office from the Antioch Police. The cellphone examinations were admitted as People's exhibit Nos. 7 and 8. Additionally, two preliminary device reports, which contain identifying information such as device ID's, account usernames, phone

numbers, and other information used to specifically identify the type and user of a specific device were admitted into evidence as People's exhibit Nos. 10 and 11. People's exhibit No. 10 belonged to Y.C.'s phone and No. 11 belonged to Norma C.'s phones. Gudbrandsen testified that she can run a specific search within these device reports, and her specific search was able to identify activity from Norma C.'s phone on August 6, between 9:27 and 9:51 p.m. The results of this specific search were introduced as People's exhibit No. 12. Ritacca objected, due to the search containing information from August 6, not August 9, the date on which Y.C. alleged the incident occurred. At sidebar, the State argued that the jury does not need to determine the date of the alleged crime, and that the text message evidence will identify that the crime occurred and Y.C. was simply mistaken as to the specific date. The trial court, over objection from Ritacca, admitted People's exhibit No. 12 into evidence. Gudbrandsen testified that the report contained three outgoing calls from Norma's phone to an unidentified number. These calls occurred at 9:30 p.m., 9:35 p.m., and 9:42 p.m. At 9:45 p.m., Norma's phone received an incoming call from a contact labeled "Mi Amor." Gudbrandsen further identified rows eight through fourteen of the report containing messages from Y.C.'s phone to Norma's phone. Sent at 9:52 p.m. on August 6, 2022, these messages stated, "[m]om, can you come?", "[d]on't tell my dad", "[c]ome to my room', and finally, "P L S" (please). Gudbrandsen further testified to a report labeled Peoples exhibit No. 13 which contained messages between the phone belonging to Norma and a phone number which was previously testified to as the defendant's. These messages spanned from August 6, 2022, at 9:52 p.m. to August 10, 2022, at 2:33 p.m. People's exhibit No. 13 was admitted into evidence.

¶ 20    During cross-examination, Ritacca attempted to ask Gudbrandsen if the alleged event did not occur on August 9. However, the trial court sustained an objection from the State, holding that

there was no foundation for Ms. Gudbrandsen to answer the question. He then confirmed that the date stamped on the forensic report started on August 6 and ended on August 10.

¶ 21    The State called Daniel August to testify. August is employed by the Lake County State's Attorney as an investigator. He conducted a translation of text message evidence, People's exhibit No. 13, from Spanish to English for the State. These messages stated:

> TEXT 30: "That's why I am telling you why she got like this? Is she crazy or what? I know that I said daughter you have some legs do you exercise and you know that I call them all legs (PATAS). I do not call them feet (PIES). I with everyone it is legs (PATAS) jokingly, but what's her deal? Then I'm going to say things as they are."

> TEXT 31: "Now I will not say legs anymore nor potbellies, nor ball like I say to them because one day they can go complain that I am bullying or that I mistreated them because I called them potbellies woman please."

> TEXT 88: "I am telling you that I didn't do anything. Now if you and her say that yes I did it, I do not remember nor did I do it intentional truthfully. I do not really know what you are talking about but if I did it I am a man and I accept my errors so do not believe that I will not accept my faults I accept everything that I do wrong and if I screwed up and let the consequences come to me I do not give a F*** for acting the fool if that is what you want I accept it."

> TEXT 103: "I never want to lose our marriage and our family; I would never do something like that. Now as I tell you if I really did it, I will ask forgiveness in person to you and her. But I never want to lose my family and much less for something like that."

TEXT 104: "That's why I tell you to stop asking her. I can ask thousands of times for forgiveness to you and her if I screwed up but believe me I would fight for you guys to any extent."

TEXT 105: "Everyone is important to me I cannot imagine a day without you, without Ariz, without Toto, without Marian, without [Y.C.] without anything; that would kill me woman"

TEXT 106: "And also, the other babe that's on the way. If I did something, no really I will accept my faults but please do not tell anyone and stop asking her about it and ask if she is willing to talk with me. We could talk for at least 5 minutes but stop asking her things she could saying and saying something that maybe never happened. And if it happened, I accept it and if it happened, why did she not do anything."

TEXT 121: "I really do everything for all of you. All of you are the most valuable thing in my life and always will be, without you I am worth nothing, and forgive me so much for joking with you all. Forgive me, forgive me, forgive me, I promise you all will never see me drunk for the remainder of my life. I swear to you and the children will no longer have a drink in the house. Please do not say anything to anyone. Tell her not even think about telling someone because truthfully if someone else does something you and I will not be able to be together anymore and I don't want that I would give up everything by my family."

¶ 22    On cross-examination, Ritacca clarified that August was not offered by the State as an expert in translation from Spanish to English. He then asked if August had ever discussed with either Norma C. or defendant the contents of the texts translated, to which he answered, no. Ritacca

then asked if the witness knew if Norma C. ever talked to the children or Y.C. about the sexual assault, which was then objected to by the State and sustained. Ritacca questioned August about different dialects of the Mexican language, and he stated that he was not familiar with them. He then proceeded down a line of questioning identifying multiple translations that were submitted despite their being typos in Spanish, or translations from words which provide no direct translation in English. The trial court then sustained multiple objections from the State when Ritacca asked the witness if the jury should believe the translations even though, in his opinion, they were wrong.

¶ 23    During Ritacca's cross-examination of Y.C., she testified that she did not talk to the police or the Department of Children and Family Service (DCFS) when the incident occurred. She stated that once the police were involved, she never took them to the woodpile where the event occurred, nor did she show them the truck and trailer which were also described in the outcry. Ritacca attempted to ask Y.C. if the police were able to see what occurred in the backyard from the cameras; however, this question was objected to by the State and their objection was sustained.

¶ 24    Y.C. testified that she was on medication, what the medication was used for, and that she had not taken any medication prior to giving testimony. At the time she was suffering from depression and anxiety. She only received an evaluation for self-harm at the hospital; no sex evaluation occurred. She told her school principal about her self-harm during the outcry. She was hospitalized for self-harm prior to the sexual assault. Ritacca then went on to question Y.C. about her statements as to why she was self-harming. The trial court prevented Ritacca from questioning the victim as to what medical personnel may have told her regarding the cause of the self-harm. Ritacca also posed a line of questions to the victim concerning her school curriculum, attendance, and admission, which were all prevented by the State's objection.

¶ 25    Additionally, during Ritacca's cross-examination of Y.C., he asked her if she uses drugs. However, the trial court sustained an objection by the State. The trial court also sustained an objection by the State when Ritacca asked if the police were called to her residence due to her smoking cannabis. He also asked if the victim smoked cannabis before appearing in court, which she answered; however, the trial court sustained an objection from the State when he asked if the victim had ever smoked cannabis, or if the victim had ever shared cannabis with her brother. He then asked the victim if she had told the principal that she was high on drugs before being sent to the hospital, which was also objected to and sustained.

¶ 26    The trial court also sustained an objection by the State concerning a line of questioning from Ritacca which attempted to identify a group chat between the victim and her friends, labelled "Suicidal Squad."

¶ 27    Ritacca also presented Defense exhibit Nos. 1 and 2 during his cross-examination of Y.C. These exhibits showed the victim's room in a dirty and messy condition, despite her testimony that she helped her mother with cleaning the house. Ritacca then attempted to show Y.C. Defense exhibit Nos. 3 and 4. These exhibits were photographs of a broken sink, and he questioned her concerning when and how the sink broke. The trial court sustained an objection of collateral irrelevant matters by the State concerning the pictures and the events surrounding the pictures. Ritacca also proceeded down a line of questioning concerning two photographs, which were not admitted into evidence, that depicted a chair below Y.C's bedroom window. Y.C. testified that she placed the chair under the window to get into the house after returning from work when no one else was home, but, she was unaware of who took the photographs. The State objected to the relevance and the foundation of this line of questioning, which the trial court sustained.

¶ 28    Y.C. testified that she had written in a journal about the charged incident. Ritacca then asked Y.C. if she had written in her journal concerning her feelings towards the defendant, and she stated she did not remember.

¶ 29    After the State rested Ritacca called J.T. to testify. J.T. testified that he and Y.C. had the same mother but different fathers. He provided his version of the events that took place during the hours of the sexual assault incident. He never saw defendant inappropriately touch the victim. J.T. could differentiate between appropriate and inappropriate touching, and he testified to the fact that he had answered questions from the police.

¶ 30    The State then conducted a cross-examination of J.T., wherein he testified that Ritacca had told him about the facts of the case. J.T. had met Ritacca before appearing in court and had been to Mr. Ritacca's office multiple times. J.T. also wrote a letter, which was submitted into evidence as People's exhibit No. 15 as a prior inconsistent statement. He wrote the letter at home at the direction of Ritacca and was instructed to return it when it was done. J.T. testified that the letter submitted into evidence was not the original, the original was written on different paper. Ritacca declined any redirect examination of J.T.

¶ 31    Defendant then testified that he is Y.C.'s stepfather. Defendant denied ever sexually assaulting Y.C. and stated that he was unsure if the alleged events or location of the events were caught on video because he was never shown any video recording. He testified about Y.C.'s "problems" such as depression, anxiety, and self-harm. He testified that his wife had given Ritacca Y.C.'s diary and it was then given to the State. The State objected to this statement, which was sustained by the trial court.

¶ 32    The jury found defendant guilty on two counts of criminal sexual assault. Following the conclusion of the trial, defendant filed a motion for a new trial. *Inter alia*, the motion argued that

the text messages between Y.C. and the guardian *ad litem* (GAL), Y.C. and her mother, and Y.C. and her boyfriend were relevant and should have been allowed into evidence. Further, the motion argued that "[t]he mother's testimony in this matter would have been to discount what she said in terms of her initial complaint. But we decided not to". The motion also argued that the court erred in not granting the pretrial motion to allow the victim's drug usage. Following a hearing on the motion, the trial court held, in relevant part, as follows:

"As to not permitting I suppose cross examination or evidence that the victim used cannabis, I continue to find that that would be irrelevant information. The witness testified I believe about prescription medication and was available to be crossed as to how that may impact her ability to recollect the events or to testify clearly. The cannabis was not an issue as to the date of the testimony, nor as to the date of the offense; and was nothing but prejudicial information that had no bearing or relevancy. As far as the diary and the messages between the victim and her boyfriend that may or may not have been of a sexual nature, again, entirely irrelevant to the issues before the Court and the jury. And was properly precluded.

\*\*\*

As to Count 6 of the original motion, the Court erred in not allowing a journal which indicated the victim dreamed of meeting her real father. Again, I don't see any relevance to that. Although I don't necessarily recall that being the offer of proof, the journal was properly excluded for that purpose."

¶ 33 During defendant's statement in allocution at the sentencing hearing, the following dialogue occurred:

" DEFENDANT: I know that this is sentence time, but I want to let you know that at that trial, I felt that I was wrongly judged. I felt that I had -- I did not receive at all any opportunity because, first of all, I was brought here to trial, and I was told that they were going to show all the evidence and all the witnesses. My lawyer, he had mentioned on two occasions there were between five and six witnesses.

THE DEFENDANT: I was always told that everything was to be – was going to be presented ***.

THE DEFENDANT: *** Up to the last day, almost two hours before the end of the trial, the lawyer told me that none of the witnesses were going to be present and neither any of my evidence. When I asked him why – he only told me two hours before – that's what he gave me, is that he and his sone, the other lawyer, that the court prohibited me from bringing witnesses and evidence.

***

THE DEFENDANT: I say again that neither my witnesses were presented – were here when my lawyer told you about them on two occasions. Also, on the first day of the trial, you asked the State and my lawyer if they have shared the evidence. They both say yes, but nothing on my part was presented.

THE DEFENDANT: *** But if you were to take into account the evidence at a new trial ***.

THE DEFENDANT: I repeat again, I think we have all the evidence to show the truth.

THE COURT: *** Mr. Tamayo, on your behalf, a motion asking for a new trial has been filed.

\*\*\*

THE COURT: Did you observe that motion and ask any questions of your lawyers before that was heard?

THE DEFENDANT: I was never showed it. That's why I was surprised when the evidence was not shown.

THE COURT: I'm talking about after the trial was over, your attorneys asked that I grant you a new trial, correct?

THE DEFENDANT: Yes.

THE COURT: Mr. Ritacca [(defense attorney)]?

MR. RITACCA: Your Honor, what you're asking him right now is a *Krankel* determination.

THE COURT: I'm trying to determine –

MR. RITACCA: And with the *Krankel* determination, he should be appointed a new attorney concerning this, Your Honor.

THE COURT: You're wrong. I have to first determine if he's raising a *Krankel* issues, which is what I'm trying to do.

MR. RITACCA: Thank you, Judge.

THE COURT: Mr. Tamayo, do you recall being in this courtroom listening to your lawyers ask for a new trial?

THE DEFENDANT: Yes.

THE COURT: Before the hearing, did you have an opportunity to review the motion and give your input, if any?

THE DEFENDANT: No, not me.

- 14 -

THE COURT: You have indicated that there were witnesses that you felt should have testified at trial?

THE DEFENDANT: Yes.

THE COURT: Did you discuss those witnesses with your lawyers?

THE DEFENDANT: Before the Trial? Yes.

THE COURT: And did they discuss whether they should or would testify on your behalf?

THE DEFENDANT: Not with them personally but with my lawyer.

THE COURT: Correct.

THE DEFENDANT: Yes, he told me that they were all going to testify.

THE COURT: What names were you hoping to testify, which individuals?

THE DEFENDANT: I don't know their names, but I know that there were from the school, the hospital, and the policeman.

THE COURT: Do you believe that they should have testified?

THE DEFENDANT: Yes. We were talking about that on, I think, the last day of trial.

THE COURT: Was there anything else about the trial that you felt should have been done differently?

THE DEFENDANT: Yes.

THE COURT: What?

THE DEFENDANT: Everything.

THE COURT: Be specific, please.

THE DEFENDANT: To show absolutely all the evidence that we had.

THE COURT: This is your moment to explain to me what evidence was not brought to trial that you believe should have been.

THE DEFENDANT: Yes, for example, we brought the diary where my daughter –

THE COURT: Anything else?

THE DEFENDANT: Hospital reports, mental health evaluations, drug problems, police reports, all of that, and nothing was presented. And the school reports and the letter from my son explaining how my daughter has been planning all of that and also the letter from her aunt explaining all the problems that my daughter has.

THE COURT: Anything else?

THE DEFENDANT: Not that I can remember. I have written it down somewhere, but I don't have it with me at the moment.

THE COURT: Anything else about the performance of your attorneys that you think you have concerns with?

THE DEFENDANT: Just that I was told that we were going to show everything, and up to the last moment, just two hours before the end I was told nothing was going.

THE COURT: Anything other than the items that you just put on the record, anything else?

THE DEFENDANT: No, I think that's it. The evidence, the reports, yes.

THE COURT: All right. For the record, I don't think that the defendant has raised a *Krankel* issue, and I'll say why. The witnesses and the evidence that he has described, in fact, Mr. Ritacca argues to admit and to offer. As far as school witnesses, they were represented by their own independent counsel, and they appeared in court. The court did rule on those on an *in limine* matter – or procedure and found over objection that they were

not admissible not relevant. That relates to the hospital evaluations for mental health issues, drug reports. I did not allow the diary that was sought to be used. Police reports normally are not admitted. School records I denied. The letters from family describing what they perceive to be problems with our complainant I likewise found to be inadmissible. All of those matters were actually addressed, argued for by your attorneys on your behalf. There being nothing else, I do not see a Krankel [sic] issue being raised.

¶ 34 Defendant submitted a motion to reconsider, which was ultimately denied. This timely appeal followed.

¶ 35                                    II. ANALYSIS

¶ 36 At issue in this appeal is whether the trial court erred in failing to adequately inquire into the defendant's *pro se* claim of ineffective assistance of counsel. At the outset, we want to clarify that the appeal concerns the actions of the trial court, not the actions of defense counsel. However, extensive background into the actions of Ritacca and the State during the trial is helpful in evaluating the trial court's *Krankel* inquiry.

¶ 37 Pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), the following procedure should be followed to determine whether new counsel should be appointed:

> "[W]hen a defendant presents a *pro se* posttrial claim for ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed.

***

The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations for ineffective assistance of counsel. During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and *usually* necessary in assessing what further action, if any, is warranted on a defendant's claim. ***. A brief discussion between the trial court and the defendant *may* be sufficient. Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of the defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face". (Emphasis added.) *People v. Moore*, 207 Ill. 2d 68, 77-79 (2003).

¶ 38     The State argues that the applicable standard of review for this case is manifestly erroneous. The State correctly identifies that this standard of review would apply when a trial court has properly conducted a *Krankel* inquiry and has reached a determination on the merits of the defendant's motion. *People v. Jackson*, 2020 IL 124112, ¶ 98. However, defendant in his reply brief identifies that his appeal concerns the adequacy of the trial court's initial *Krankel* inquiry, not the final determination of the court. Whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo. Jackson*, 2020 IL 124112, ¶ 98. *Accord People v. Moore*, 207 Ill. 2d 68, 75 (2003); *People v. Washington*, 2012 IL App (2d) 101287, ¶ 17. Therefore, the applicable standard of review for this appeal is *de novo*.

¶ 39     At defendant's preliminary *Krankel* examination, he stated that he felt there were more witnesses who should have testified on his behalf, and that this was discussed with Ritacca. The trial court asked defendant for the names of these individuals, which he did not know, but knew they were from the school, hospital, and a police officer. The trial court then asked for other

specific issues defendant had with the performance of Ritacca. He believed all the evidence should have been used in his defense. Defendant specifically referenced the following: the diary, hospital reports, mental health evaluations, drug problems, police reports, school reports, a letter from his son, and a letter from the victim's aunt. The trial court asked defendant if there was anything else, and he did not remember anything else. Defendant stated he had it written down but did not have the list with him. The trial court asked if there were any further concerns defendant had with Ritacca. He stated that Ritacca told him they would show everything, and that just two hours before the conclusion of the trial, he was informed nothing was going to be used.

¶ 40    In *Jackson*, our supreme court held that the decision to call witnesses is a matter of trial strategy and generally reserved to the discretion of trial counsel. 2020 IL 124112, ¶ 106 (quoting *People v. Kidd*, 175 Ill. 2d 1, 45 (1996)). Mr. Tamayo's *pro se* motion refers to witnesses from the school, hospital, and police department. The decisions surrounding the use of certain witnesses are entirely trial strategy, which is under the direction and control of trial counsel. The applicable case law is clear. "If the trial court determines that the claim lacks merit or *pertains only to matters of trial strategy*, then the court need not appoint new counsel and may deny the *pro se* motion. (Emphasis added.) *Moore*, 207 Ill. 2d 68, 78 (2003).

¶ 41    The defendant's appeal argues that the trial court improperly dismissed the *pro se* motion by not talking to defense counsel because each piece of evidence was not completely prohibited from admission into evidence. This argument is not persuasive. In *Moore*, our supreme court stated that some interchange between the trial court and defense counsel is permissible and *usually* necessary, it does not say the interchange is mandatory. (Emphasis added.) *Id*. Here, although the trial court did not have a discussion with defense counsel, the inquiry was adequate as defendant's claims were entirely based on issues concerning trial strategy. Defendant believes the diary,

hospital reports, police reports, mental health evaluations, school reports, the victims' drug issues, and letters from his son and the victims' aunt all should have been used during the trial. Each one of these items identified are evidence, and defense counsel has control over the decision on what and how evidence should be used. Again, the applicable case law is clear. "If the trial court determines that the claim lacks merit or *pertains only to matters of trial strategy*, then the court need not appoint new counsel and may deny the *pro se* motion. (Emphasis added.) *Id.*

¶ 42     Finally, it should be noted that during a *Krankel* inquiry, only if the defendant's allegations indicate neglect from trial counsel should the court appoint new counsel. *People v. Ramey*, 152 Ill. 2d 41, 52 (1992). Here, the record clearly shows that Ritacca was anything but neglectful towards defendant's case. Ritacca attempted to bring in additional evidence and testimony before, during, and after the trial. Second, defendant's brief argues that the letter from his son was never discussed during trial. This is factually incorrect. The letter was discussed by the State during their cross-examination of J.T. We do not view the decision of Ritacca to place no emphasis on this letter as neglectful. The defense instead chose to put J.T. on the stand to provide live testimony, a tactical decision. Third, the failure to introduce an unknown police officer is not indicative of neglect of the case. Ritacca performed extensive cross-examination of Detective Nemec, Carol Gudbrandsen, and Daniel August. The record fails to support the indication that Ritacca neglected defendant's case by failing to call an additional "policeman" to testify.

¶ 43     The record supports the trial court's familiarity with the evidence and witnesses that Ritacca attempted to use throughout the trial. The same evidence and witnesses mentioned in the defendant's *pro se* motion and this appeal constitute the same evidence and witnesses argued for before trial, during the trial, and in defendant's motion for a new trial. Consequently, as previously stated, the submission and use of evidence and witnesses during a trial are considered trial strategy,

and a finding of trial strategy fails to raise a valid *Krankel* issue.

¶ 44                                    III. CONCLUSION

¶ 45    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 46    Affirmed.